In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00286-CV**
_____

**IN RE COMMITMENT OF JEFFREY SCOTT POPE**

**On Appeal from the 260th District Court**
**Orange County, Texas**
**Trial Cause No. D220361-C**

**MEMORANDUM OPINION**

The State of Texas filed a petition to commit Jeffrey Scott Pope (Pope or Appellant) as a sexually violent predator. *See* Tex. Health & Safety Code Ann. §§ 841.001-209 (SVP statute). A jury found that Pope is a sexually violent predator. The trial court rendered a final judgment and order of civil commitment. After the trial court denied Pope's motion for new trial, he timely filed a notice of appeal. In three issues, Pope challenges the legal and factually sufficiency of the evidence supporting the jury's verdict and challenges the trial court's *Allen* charge to the jury. We affirm.

## Pope's Testimony

Pope testified that at the time of trial he was forty-nine years old and had been in prison for twenty-two years. He was serving concurrent forty-two-year sentences for three convictions of aggravated sexual assault of a child. Pope testified that he committed the offenses in February 2001 when he was twenty-seven years old and living in Bridge City. His three victims were Ricky, Chris, and Justin,[1] whose ages at the time of the offenses ranged from approximately nine to eleven years old. Pope recalled that the boys' mothers would often have Pope babysit the boys, that he would see them three or four times a week, and they would fish, swim, and ride the four-wheeler together. According to Pope, he pleaded guilty to one of three of the alleged offenses for each victim, and he pleaded guilty because he was guilty of those offenses. Pope's penitentiary packet with the indictments and judgments of conviction was admitted at trial and published to the jury.

Pope recalled that he spent time with Ricky because Pope was friends with Ricky's parents, and that he lived with them for a couple of weeks while he was looking for his own place to live. According to Pope, he had known Ricky for about

---

[1] We refer to the victims by pseudonyms to protect their privacy. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

six months before Pope sexually assaulted him. Pope testified that one night in February 2001, Ricky and Pope were watching a movie with sexual content, Ricky began asking Pope questions about sex, and it escalated into Pope sexually assaulting Ricky. Pope testified that he was under the influence of cocaine and ecstasy, but he recalled that he rubbed Ricky's penis, exposed his penis to Ricky, put his mouth on Ricky's penis, and was aroused. According to Pope, he went into the bathroom, masturbated into a towel, and showed Ricky. Pope testified that at the time he knew his actions were wrong.

Pope testified that the following night, he also sexually assaulted Chris and Justin when they came over with Ricky. Pope testified that he knew Chris because he used to date Chris's mother and Chris's mother and Ricky's mother were sisters. Pope had known Chris for about six months before sexually assaulting him, and he lived with Chris's mother at times and would spend time with Chris. Pope recalled that he met Justin, a friend of Chris's, through Chris, and Pope spent time with Justin's father. Pope knew Justin for about two months before sexually assaulting him.

Pope testified that Ricky had told Chris and Justin about the sexual contact the night before, the three boys were all in the same room with Pope, and the boys were joking and asking about sex. Pope recalled being sexually aroused by the conversation and he had the boys masturbate him. Pope admitted he sucked Chris's

3

penis, touched Chris's penis with his hands, and ejaculated. Pope testified that he might have put his penis in Chris's mouth, but he could not remember because he was under the influence of cocaine and ecstasy and had consumed ten or twelve beers that day. Pope recalled that he put Justin's penis in Pope's mouth and asked Justin to touch Pope's penis. Pope testified that he knew what he did to the boys that night was wrong. Although he remembered telling police around the time of the investigation that Justin threatened him and made him engage in sexual acts with him, Pope testified that he forced the boys to engage in sexual activity and the boys did not want to engage in the acts.

Pope denied being sexually attracted to young boys or to Ricky, Chris, and Justin. He acknowledged that the drugs and alcohol "didn't make [him] do it[]" and that he knew his acts were wrong. Pope testified that he offended against Ricky those two times and offended against Chris and Justin once. He recalled that he told the boys not to tell anyone what he did to them. According to Pope, Ricky, Chris, and Justin trusted him and felt safe with him. Pope testified that the boys were safe with him other than the two nights, even though the boys said Pope sexually offended against them on other occasions.

Pope testified that he believed that his forty-two-year sentence was a fair punishment. Pope denied ever sexually offending Ricky's three-year-old brother, Andy, and denied sexually offending Jacob, who was the other boys' neighbor. Pope

also denied sexually offending Billy, the eleven-year-old son of a woman Pope dated around 1999, although Pope agreed he told the police investigating the offenses for which he is currently serving sentences that he had touched Billy's penis four or five times. Pope agreed that he told police investigating the offenses for which he is currently serving sentences that he also masturbated Jack and performed oral sex at least two times on Jack, an eleven-year-old son of a woman Pope dated in 1997 or 1998, but Pope denied at trial that he ever sexually offended against Jack.

Three voluntary statements that Pope provided to police on February 12, 2001, February 13, 2001, and February 24, 2001, were admitted into evidence and published to the jury. Pope testified that in the February 12, 2001 statement he said he "was supposably involved in molesting boys[]" and he placed blame on Ricky, Chris, and Justin in the statement. In the statement, he did admit to masturbating and ejaculating into a towel and showing Ricky. Pope admitted that he did not want to tell the police the truth because he feared getting in trouble and had guilt because he knew that he was wrong and that he had "hurt those kids[.]"

Pope testified that he lied in the February 13, 2001 statement when he said that the boys "lured [him] into making a couple of strokes on [Ricky]." Pope also said in the statement that he was scared that Chris would get mad and threaten him because Chris had been possibly abused by two other men prior to Pope, and that Pope was afraid of getting caught and having his probation revoked.

5

Pope recalled that in his February 24, 2001 statement, his story changed and he said he "want[ed] to get it out in the open" and "want[ed] to get help, and [he] want[ed] them to get help." He admitted in that statement to offending against Ricky, Chris, and Justin, but Pope testified that some of the statement was not the truth. Pope testified that he admitted to sexually abusing Jack and Billy even though the police had not mentioned those boys because Pope had been picked up by a group of people including the father of one of Pope's victims, and that man put a gun to Pope's head and told him to admit to the police that he sexually offended against Jack and Billy. According to Pope, he never sexually offended against Jack or Billy.

Pope testified he was sexually abused when he was nine years old and has not talked about the abuse until recently. He explained it was a traumatic experience that he is learning to cope with and that his therapist wants him to get therapy for the abuse. According to Pope, even though he knew how it felt to be sexually abused, he still offended against the three boys. Pope recalled that at the time of the offenses against the boys he was on probation for credit card abuse in 1997 or 1998 for using a credit card he found that did not belong to him. He pleaded guilty to the offense and was placed on probation for three years. The deferred adjudication order that related to his credit card abuse offense was admitted into evidence and published to the jury. Pope recalled that he had difficulty following the rules "in the free world[,]"

but that in the last few years he followed the rules, and prior to that he had seven minor disciplinaries and no sexual misconduct write-ups.

Pope testified that he first started using drugs and alcohol in his early teens and was using a gram of cocaine along with alcohol every day "in the free world," and he got into a lot of trouble because of it. He continued to drink alcohol while in prison and last consumed alcohol two years before trial. He also continued to use drugs while in prison and last used drugs in 2014. He acknowledged if he was caught using drugs or consuming alcohol in prison that it would be a major disciplinary that could lead to a criminal case. Even though he admitted that it is easier to get drugs and alcohol "in the free world" than in prison, he stated he had no intentions of drinking alcohol and using drugs when released, he has no problem with drugs or alcohol, and he was planning to participate in drug and alcohol treatment programs upon his release. Pope admitted to drinking and using drugs while on probation.

Pope testified that he is in a nine-month sex offender treatment program with one month remaining. He recalled that he has learned about empathy, remorse, his triggers, and deviant behaviors. He testified that in the past his triggers for sexually offending were watching pornography, drinking, and using cocaine so he intended to stay away from those negative things by working a lot. He testified that the difference in him from when he entered prison from who he is now is a "night-and-day difference[]" and that he is wiser and more mature. He also explained that his

family will keep him "in check" if they think he is doing drugs or doing anything deviant, but he also admitted that those family members were also around when he was offending before. He testified that he has good family support now because after he got arrested, his family became aware of what was going on and would help keep him out of trouble. He identified his high-risk situations as being around kids, and he agreed there are kids in his family. He testified he learned a lot about his sexual offending behaviors but will still be going to a therapist to learn more when he gets out of prison and finds a therapist. He also intends to attend Alcoholics Anonymous and Narcotics Anonymous meetings once released.

According to Pope, he is a sex offender, he fully understands how to avoid re-offending sexually in the future, and his plan is to stay away from pornography, drugs, and cocaine. He testified that he was not sexually attracted to any of the boys he sexually offended against. Pope believes that he is no longer a danger to children but that he still plans to not be around children because he does not want someone to falsely accuse him. Pope does not believe he is at any risk to re-offend sexually when he is released because he knows what triggered his thoughts. Pope expressed remorse for sexually offending against Ricky, Chris, and Justin, and believed he deserves to be in prison. He believes he acted out sexually against the boys because "it's a triggering effect from [his own] abuse." Pope testified he has never been sexually attracted to children, currently has no problem with rules or authority, and

now has empathy for others. He testified that he did not have sexual urges for the three boys, that the offenses occurred because he was having problems, and it made him feel good that the boys looked up to him. He believes he will not commit another offense because he does not want this to happen again to someone, and he believes he is in control of his sexual urges. He feels he can avoid unsupervised contact with children by letting everyone around him know that he cannot be around children and that if he wants a girlfriend, he will date an older woman that would not have younger children. According to Pope, he does not have a behavioral abnormality that makes him likely to commit a sex offense, nor is he a sexually violent predator.

Pope regretted dropping out of school but has been trained in "welding, paint and body, air-brushing, and heavy equipment[,]" and in prison received certificates of achievement in automobile bodywork and for a painter's helper. Pope intends to go back to welding upon his release and do air-brushing on the side. According to Pope, he plans to register as a sex offender, comply with his conditions upon his release, go to a halfway house, and live near Corpus Christi.

Testimony of Dr. Darrel Turner

Dr. Darrel Turner, a forensic psychologist, testified that he evaluated Pope in May of 2022 to determine if he had a behavioral abnormality. Dr. Turner has authored papers, published studies, attended training, provided training, and worked in the field of forensic psychology. Dr. Turner treated sex offenders when he worked

9

in the federal prison system as well as in private practice. He is on contract through the State of Texas to do the initial behavioral abnormality evaluation when a sex offender with the requisite number of offenses has been referred for an evaluation. Dr. Turner has been conducting these evaluations since 2013, and on average conducts two to four a month. He has testified at trial for purposes of behavioral abnormality cases "around 80, 85[]" times and conducted between 500 and 600 behavioral abnormality evaluations. Dr. Turner's curriculum vitae reflecting his education, training, and experience was admitted into evidence and published to the jury.

According to Dr. Turner, he interviewed Pope virtually for approximately two hours through a program similar to Zoom while Pope was incarcerated. Dr. Turner testified that he was able to fully conduct a behavioral abnormality evaluation of Pope despite only meeting through the virtual platform and that Pope consented to the interview. Dr. Turner recalled that he explained to Pope the purpose of their meeting and that, as far as Dr. Turner could tell, Pope understood the purpose. Dr. Turner submitted his report from the evaluation to the Texas Department of Criminal Justice.

Dr. Turner testified that his testimony was within the scope of forensic psychology, that he utilized and relied on the principles of forensic psychology during his evaluation of Pope, and that his interview with Pope was done in

10

accordance with his training as a psychologist and with acceptable standards in the field of forensic psychology that are based on reliable scientific data. Dr. Turner explained that in determining whether a person has a behavioral abnormality he looks at the main risk factors that contribute to a person's likelihood of re-offending such as sexual deviance, sexual attraction to children, sexual attraction and offending against male children, antisociality, how criminally-minded and -acted the person is, and whether the person was intoxicated at the time of the offense. When making a behavioral abnormality determination, Dr. Turner also considers a person's overall history, including both sexual and nonsexual criminal history, the person's testimony, and the details of the offenses. According to Dr. Turner, protective factors such as age and treatment can lower a person's risk for re-offending, so those factors are also considered. Dr. Turner testified that there is no test for making a behavioral abnormality determination, and no specific score on an instrument is required for the determination that someone has a behavioral abnormality.

Dr. Turner described Pope's demeanor during the interview as polite and "clearly nervous[,]" and Dr. Turner believed that Pope was evasive in answering Turner's questions and "side-stepped a lot of questions and tried to rephrase them and answer them a little bit differently." Dr. Turner noted that Pope continuously stated that he "was just being honest[,]" which Dr. Turner testified has been shown to be a frequent response pattern "when people are engaging in denial or

11

minimization of something that they've done, specifically a sexual offense." Dr. Turner reviewed approximately 1,500 pages of records in this case, 100-200 of which were provided to him before he evaluated Pope. According to Dr. Turner, the additional documents he received after his evaluation of Pope reinforced his opinion about Pope. Dr. Turner reviewed Pope's deposition and learned that Pope "still seems to be employing a lot of the sort of blame strategies [and] blaming victims, and making it seem as though he sort of gave in to these child -- sexual pressure and things like that[.]" Dr. Turner recalled that he discussed Pope's sexual offenses with him when they met, and Dr. Turner reviewed records detailing Pope's sexual offenses.

Dr. Turner testified that the records indicated that Pope fondled Ricky at least five times and that Pope performed oral sex on Ricky and licked his genitals. As for Chris, the records indicated that Pope fondled him and masturbated him until he ejaculated. Dr. Turner recalled that the records indicated that Justin was fondled by Pope, they masturbated each other, and that Justin witnessed Pope sexually offending against Chris.

Dr. Turner believed that Pope was more truthful in his statements during the investigation of the offenses than he is currently, in that he admitted sexually molesting additional boys over the prior years that he was not ultimately convicted for, but now denies sexually offending against those other boys. Dr. Turner believed

12

that this is more evidence of a pattern of sexual deviance. Dr. Turner testified that during his interview with Pope, Pope admitted to offending against Ricky, Chris, and Justin for which he was convicted but admitted "to the less egregious act[s]" such as fondling and masturbating but did not acknowledge other behaviors like performing oral sex and his "prolific" grooming of the boys. Dr. Turner also recalled that Pope minimized the length of time over which he sexually offended the three boys and denied that it occurred for long periods of time as reported by the boys. Dr. Turner believed, based on Pope's admission during his deposition and at trial, that Pope performed oral sex on at least one of the boys, that Pope had made some progress in acknowledging what he had done. According to Dr. Turner, in Pope's deposition, he reported that the abuse occurred on two different nights and was detailed about the substances he was under the influence of, but during the interview he told Dr. Turner that the abuse occurred on one night. Dr. Turner testified that Pope was initially charged with nine counts of aggravated sexual assault of a child—three for each of Ricky, Chris, and Justin. Dr. Turner agreed that the offense of aggravated sexually assault of a child is a sexually violent offense under Chapter 841.

Dr. Turner recalled that Pope's offenses occurred in January and February 2001, but that "the records indicate that they . . . happened [] across time, not just on those specific dates." According to Dr. Turner, it was significant that Pope's victims

13

were nine-, ten-, and eleven-year-old boys, and that with at least one of the boys, Pope was in a position of "power" in the child's eyes because Pope was dating the child's mother. Dr. Turner testified that this "power differential" in a case involving young male victims is important because "it speaks to a level of conning and manipulation that speaks to antisociality." Dr. Turner testified that research shows that offenders that offend against prepubescent children and males who offend against male victims are important risk factors, and both of those are separate and distinct risk factors in this case. Dr. Turner identified Pope's sexual deviance and pedophilic disorder as risk factors for Pope re-offending. Dr. Turner testified that the details of Pope's sexual offenses are important to Turner's determination of behavioral abnormality because the details provide insight into Pope's antisociality and sexual deviance. According to Dr. Turner, antisociality and sexual deviance are the two largest risk factors considered "and if they exist together, then a person's risk is especially dangerous."

Dr. Turner also explained that Pope's role in the length of time he spent around the victims is "characterized a good bit by grooming[]" and that he made efforts to prevent his victims from disclosing. Dr. Turner noted that Pope's efforts to not only groom the victims but also to groom the parents of the victims—known as "environmental grooming"—increase Pope's risk of re-offending sexually because it evidences that Pope has difficulty controlling his behavior (even

14

offending while on supervision) and creates a dangerous combination of criminal behavior and sexual deviance. The number of Pope's victims, the ages of the victims, and the fact that Pope sexually offended when he could have easily been caught, factored into Dr. Turner's opinion on whether Pope suffered from a behavior abnormality. Dr. Turner recalled that Pope was approximately twenty-eight years old when he committed the offenses, and that his age was significant because he is clearly an adult offending against clearly prepubescent children. Dr. Turner testified that Pope's "paint[ing] himself out to really be a victim [and] fell to the advances of [Chris]" as well as and Pope's taking a "victimstance" are risk factors for Pope's risk of re-offense. Dr. Turner explained that Pope's statements suggesting that his victims were sexually aggressive towards him and that he "gave into it[]" is consistent with statements by true pedophilic sex offenders and indicates that Pope suffers from the chronic condition of pedophilic disorder. Pope's substance use at the time of offending is also a risk for re-offending. Dr. Turner noted that Pope has had a "fairly prolific history of substance abuse [] in prison."

Dr. Turner testified that he also relies on unadjudicated allegations when conducting an evaluation for behavioral abnormality because only about one percent of sexual offenses that occur in the United States every year end in a conviction, although Dr. Turner acknowledged that he gives unadjudicated allegations less weight. He explained that it is standard practice in risk assessments in these types of

15

evaluations to consider unadjudicated offenses. He noted that, in this case, the unadjudicated allegations are important because Pope confessed to the police about some of the allegations. According to Dr. Turner, the records indicated that there were additional allegations made against Pope for sexual offending other children around the time he offended against Ricky, Chris, and Justin. The allegations included that Pope fondled and digitally penetrated the anus of Chris's three-year-old brother, Andy. Dr. Turner acknowledged that Pope never admitted to that offense, but that a victim that young would indicate a larger victim pool for Pope and suggest a more sexual deviance. The records also referenced allegations from an eleven-year-old boy, Jacob, that Pope fondled him, and that Pope made a statement that the allegations were a result of a "revenge motive[]" because Jacob's father did not like Pope. Dr. Turner recalled that in his interview with Pope, Pope also denied that he offended against Jacob.

Two of the unadjudicated allegations that Pope did admit to in statements during the investigation were offenses against Billy and Jack, and Dr. Turner explained that the records did not indicate that law enforcement had any knowledge of the victims or offenses prior to Pope's statements. The records indicated that Pope reported to police that multiple times in the three or four years prior to 2001, he was living with Billy's mother and Pope stated he fondled eleven-year-old Billy, masturbated Billy, and had Billy masturbate him on multiple occasions where they

16

were living. As for eight-year-old Jack, Pope informed law enforcement that on about two occasions he fondled Jack, masturbated Jack, performed oral sex on Jack, had Jack masturbate him, had Jack fondle him, and had Jack perform oral sex on him.

Dr. Turner also considered in his evaluation that Pope was under supervision for credit card abuse, and Dr. Turner explained that it is considered because one of the factors for the checklist for psychopathy—that Pope was on a type of conditional release and violated it—indicates difficulty with following the rules. Dr. Turner explained that he did not believe Pope was able to follow the rules in the free world, and although Pope has not gotten in trouble for sexual misconduct in prison, this is typical among pedophilic offenders because there are no children in prison to offend against. Ultimately, Dr. Turner believed that Pope's "risk factors far outweigh the protective factors."

As for positive factors, Dr. Turner testified that Pope received on-the-job training and his G.E.D. in prison, he engaged in sex offender treatment, and that he only had eight disciplinaries while incarcerated over twenty years. Pope also was still in contact with family, so he has some family support. According to Dr. Turner, the fact that Pope is almost fifty years old at the time of trial is a protective factor because in some cases there is a decrease in risk of re-offense after a certain age. However, Dr. Turner explained that pedophilic offenders tend to re-offend more

across time and later in life. Dr. Turner noted that Pope's sex offender treatment notes indicate that Pope has made an effort in treatment but that he has not "fully grasped the concepts of treatment, specifically blaming victims, sexualizing children, [and] considering himself a victim[.]" Turner explained that based on his review of the records indicating that Pope does not understand why he sexually offended against the boys, Pope would have limited insight and ability to use tools to not re-offend when he feels impulses to re-offend. Dr. Turner added that even if Pope completed the nine-month sex offender treatment program, it would not change Turner's opinion that Pope suffers from a behavioral abnormality and that Pope would need more sex offender treatment.

Dr. Turner testified that the PCL-R is a tool or test that allows a person to be scored to see where they "fall[] on the spectrum of psychopathy compared to . . . adults that are not inmates or have no criminal history[]" and is a measure of antisociality and psychopathy. Dr. Turner scored the PCL-R for Pope, using information from the records, and information Turner gathered from the interview, and how Pope engaged in the interview. In scoring the PCL-R for Pope, Dr. Turner noted Pope's highest scores were in areas of antisociality but that his score of "20" did not fall in the range of a prototypical psychopath. Dr. Turner testified that "the majority of his points came because of personality traits and emotional functioning" and that the "elevated" score of "20" places Pope "somewhat higher than the average

pedophilic offender[]" and "about four points lower than the average adult male inmate[.]"

Dr. Turner testified that the Static-99R is an actuarial instrument that is often used in these cases to measure how likely a sex offender is to be arrested or convicted for another sex offense after their release. Dr. Turner explained that he did not need to score the Static-99R to identify all the risk factors for Pope and that he identified the same risk factors that he would have if he had scored the Static-99R, such as the fact that Pope's victims were male, which would increase his Static-99R, and therefore was something that Dr. Turner took into account as a risk factor in his assessment and opinion. According to Turner, the Static-99R does not fully capture a person's risk because it is not comprehensive and is "mostly used as a screening tool [] for large groups [when there is no] time or resources to do an actual evaluation [] on each individual." Dr. Turner noted that there are research-based risk factors that are not included on the Static-99R such as dynamic factors (factors that can change over time) like substance abuse history and the degree of antisociality. Dr. Turner explained that someone with a low score on the Static-99R may have a behavioral abnormality. He no longer scores the Static-99R and did not in this case because he believes the actuarial is "misused[]" and "an underestimate[]" and "misleading[]" because "[t]here's too much that's not assessed on that instrument to score[.]" Dr. Turner agreed that the Static-99R was at one time considered the "gold

standard" for what it is used for and an actuarial he used to score, but he testified that research in the field of psychology and learning more in the evolving field about sexual re-offending has proven it to be a weak measure. Turner explained that he is not the only one in his field who has realized the weaknesses of the Static-99R, and that he and several colleagues were in the process of writing an article about that and that someone else just published an article called, "The Death of the Static." Turner acknowledged that other psychiatrists that testify as experts in these types of cases score the Static-99R and that their opinions are no less reliable.

Dr. Turner used the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (DSM-5), a clinician's handbook of the mental disorders recognized by the American Psychiatric Association, to diagnose Pope with "[p]edophilic disorder, nonexclusive type, attracted to males[,]" meaning that Pope's pedophilia is not the only source of his sexual arousal. Dr. Turner testified that Pope's own sexual abuse that he suffered as a child did not make him sexually offend, but that he is antisocial enough that he is willing to break the law and hurt children to satisfy that attraction. Dr. Turner explained that Pope's pedophilic disorder is a chronic condition and attraction to children that may wane in the future but will be lifelong. Turner testified that he also diagnosed Pope with "unspecified personality disorder" with antisocial and narcissistic features which means that he has criminal behavior, manipulates others, lies, has a sense of entitlement, and sees himself in an elevated

way. Dr. Turner believes that this personality disorder relates to his finding that Pope has a behavioral abnormality because Pope has sexually deviant interests that he has acted on repeatedly across time and while on supervision and the personality disorder "could fuel his willingness to act on those urges." Dr. Turner considered making more diagnoses for Pope related to substance abuse but felt like more information was needed, so Turner "erred on the side of being conservative and did not make a substance-use diagnosis." However, Turner testified that he would not have disagreed with someone else if they gave Pope a substance abuse disorder diagnosis, and Turner believes that there is concern if Pope uses substances when he is released because his past acts show that substance abuse can lower his inhibition, and he has also not had substance abuse treatment.

Dr. Turner testified that the two disorders that he diagnosed Pope with—pedophilic disorder and personality disorder—are predictive of future violence especially when combined. He used these diagnoses along with the research-based risk factors in determining whether Pope has a behavioral abnormality. According to Dr. Turner, Pope's sexual offenses and diagnoses support that his emotional or volitional capacity has been affected and is still affected, and that he is a menace to the health and safety of others. Dr. Turner explained that, considering Pope's sexual deviance, personality disorder with narcissistic and antisocial features, long history of substance, and his other risk factors, his risk for re-offending sexually is

significantly increased as compared to other sex offenders and is "quite high." Dr. Turner testified that, based on his education, training, and experience, he believes Pope suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence.

On cross-examination, Dr. Turner acknowledged that there is no manual instructing how to conduct behavioral abnormality evaluations, and that although he is not aware of any formal training for these evaluations, he has twice provided others training as to the process of the evaluations and how to avoid bias. Dr. Turner explained that he is required to assess for psychopathy when he does an evaluation and that he used the PCL-R assessment tool to do so in this case. He testified that there are other tools that can be used to test for psychopathy and that even though the PCL-R was not designed to be a risk assessment instrument or predict re-offending, "[i]t just so happens that it does."

Dr. Turner admitted that in the past he has testified that the Static-99R is the best tool available for determining an offender's risk of getting reconvicted for a sex offense and that the tool was developed after extensive research and statistical analysis. Dr. Turner reiterated that he did not use the Static-99R in his assessment of Pope because it can be misleading, and he testified that there are other actuarial instruments available to use but that those are "generally made by the same people and had the same problem." According to Dr. Turner, he reviewed records that

22

included someone at the Texas Department of Criminal Justice that performed the Static-99R as to Pope. Dr. Turner acknowledged that neither the PCL-R nor the Static-99R can guarantee if someone is going to re-offend sexually, and that his colleagues use both the PCL-R and the Static-99R in their behavioral abnormality evaluations.

Pope did not call any witnesses.

The SVP Statute

In an SVP civil commitment proceeding, the State bears the burden to prove beyond a reasonable doubt that the respondent is a sexually violent predator. *See* Tex. Health & Safety Code Ann. § 841.062; *In re Commitment of Morales*, 98 S.W.3d 288, 291 (Tex. App.—Beaumont 2003, pet. denied) (per curiam). A person is a sexually violent predator if the person "is a repeat sexually violent offender[] and suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." Tex. Health & Safety Code Ann. § 841.003(a). A behavioral abnormality is "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2).

Legal and Factual Sufficiency

In his first issue, Pope challenges the legal sufficiency of the evidence supporting the jury's finding. Pope argues that Dr. Turner has recently rejected the Static-99R and "now eschews the actuarial approach in favor of an unstructured clinical-judgment approach intolerably infected with his own personal subjectivity." According to Pope, the Texas Supreme Court in *In re Commitment of Bohannan*, 388 S.W.3d 296, 305 (Tex. 2012), "all but expressly repudiated Dr. Turner's new method[.]" Pope argues that

> Dr. Turner now takes a cafeteria approach to a behavioral-abnormality finding. He selects from among the Static-99R's ten risk factors as it suits his purposes, yet rejects the Static-99R's predictive values, thereby undermining its cohort-tested structure. He favors the Static-99R's scientifically-tested risk factors but repudiates its scientifically-tested percentile values associated with those risks. As a result his behavioral-abnormality opinion is as efficacious as a casino game of chance—grossly inadequate for a jury's verdict which must be found on legally-sufficient evidence beyond a reasonable doubt.

(footnotes and emphasis omitted).

In his second issue, Pope challenges the factually sufficiency of the evidence supporting the jury's finding. Pope contends that because Dr. Turner did not use the Static-99R in his assessment of Pope, despite Turner's admission that the Static-99R is the best actuarial instrument to assess risk for sexual recidivism and that his colleagues use it, Dr. Turner "has jettisoned the more objective clinically-adjusted actuarial approach in favor of his subjective clinical-judgment approach." Pope also

24

relies on other SVP cases where the expert used the Static-99R as part of their assessment for a behavioral abnormality.

Under a legal sufficiency review, we assess all the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could find, beyond a reasonable doubt, the elements required for commitment under the SVP statute. *In re Commitment of Mullens*, 92 S.W.3d 881, 885 (Tex. App.—Beaumont 2002, pet. denied). It is the factfinder's responsibility to fairly resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id.* at 887. Under a factual sufficiency review, we weigh the evidence to determine "whether a verdict that is supported by legally sufficient evidence nevertheless reflects a risk of injustice that would compel ordering a new trial." *In re Commitment of Day*, 342 S.W.3d 193, 213 (Tex. App.—Beaumont 2011, pet. denied).

To preserve for appeal a sufficiency complaint that challenges the expert's underlying methodology or the reliability of his testimony, an objection must be raised before trial or when the State offers the opinion in evidence. *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232-33 (Tex. 2004). Even if such objection is made to the expert's testimony, the party opposing the expert's testimony must obtain an adverse ruling on the objection to preserve error for review. *See* Tex. R. App. P. 33.1(a)(2); *In re Commitment of Arnold*, No. 09-15-00499-CV,

2016 Tex. App. LEXIS 9351, at *19 (Tex. App.—Beaumont Aug. 25, 2016, pet. denied) (mem. op.) (citing *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409 (Tex. 1998)). According to our appellate record, Pope did not object to the reliability or methodology used by Dr. Turner prior to trial or at the time Dr. Turner testified. To the extent Pope on appeal is challenging Dr. Turner's methodology or the reliability of his testimony,[2] Pope's challenge was not preserved. *See* Tex. R. App. P. 33.1(a)(2).

"When a scientific opinion is admitted in evidence without objection, it may be considered probative evidence even if the basis for the opinion is unreliable." *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009). Nonetheless, a verdict

---

[2] In his Reply Brief, Pope contends that he did not waive error because his legal sufficiency challenge is based on his argument that Dr. Turner's testimony is conclusory and subjective because he rejected the Static-99R and "eschews the actuarial approach in favor of an unstructured clinical-judgment approach intolerably infected with his own personal subjectivity." This Court explained in *In re Commitment of Arnold* that complaints regarding an expert's "use of or misapplication of actuarial tests and [the expert's] alleged failure to provide authoritative support for [the expert's] opinions concern the foundational data used or relied on by the expert in reaching [the expert's] opinions." *See* No. 09-15-00499-CV, 2016 Tex. App. LEXIS 9351, at *21 (Tex. App.—Beaumont Aug. 25, 2016, pet. denied) (mem. op.) (citing *In re Commitment of Sprague*, No. 09-10-00228-CV, 2011 Tex. App. LEXIS 4503, at **28-29 (Tex. App.—Beaumont June 16, 2011, no pet.) (mem. op.)). Nothing in the SVP statute requires an expert to use a particular actuarial instrument in evaluating a person for a behavioral abnormality. *See* Tex. Health & Safety Code Ann. §§ 841.001-209. We also do not read the Texas Supreme Court's opinion in *In re Commitment of Bohannan* to require experts to use a particular actuarial in assessing a person for a behavioral abnormality. *See* 388 S.W.3d 296 (Tex. 2012).

cannot be sustained on a mere *ipse dixit* of a credentialed witness. *Id.* "[I]f no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection." *Id.*

Dr. Turner provided a basis for his opinion that Pope has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. Dr. Turner also testified as to Pope's diagnoses and high risk of sexually reoffending. The jury heard Dr. Turner testify as to extensive experience in the field, and that he has testified at trial for purposes of behavioral abnormality cases "around 80, 85[]" times and conducted between 500 and 600 behavioral abnormality evaluations. The jury heard Dr. Turner's testimony that his testimony was within the scope of forensic psychology, that he utilized and relied on the principles of forensic psychology during his evaluation of Pope, and that his interview with Pope was done in accordance with his training as a psychologist and with acceptable standards in the field of forensic psychology that are based on reliable scientific data. Dr. Turner explained his methodology in detail, including the many factors he considers in determining whether a person has a behavioral abnormality that makes the person likely to sexually re-offend. The jury also heard Dr. Turner testify that there is no test for making a behavioral abnormality determination, and no specific score on an

instrument is required for the determination that someone has a behavioral abnormality.

Dr. Turner testified that he used the PCL-R instrument to assess Pope's psychopathy, he explained that he did not need to score the Static-99R to identify all the risk factors for Pope, and he identified the same risk factors that he would have if he had scored the Static-99R. The jury also heard Dr. Turner testify that he no longer scores the Static-99R because it has weaknesses because it is not comprehensive, it can be misleading, and it is misused. The jury was presented with Pope's testimony about his offenses, Dr. Turner's testimony about what the records revealed about Pope's offenses, and Dr. Turner's testimony about what he observed during his interview of Pope. Ultimately, Dr. Turner testified that, based on his education, training, and experience, Pope suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. Dr. Turner explained in detail the facts and evidence he found relevant in forming his opinions and the role those facts played in his evaluation. His testimony was not so conclusory or speculative as to be completely lacking in probative value. *See Arnold*, 2016 Tex. App. LEXIS 9351, at **22-23 (citing *In re Commitment of Moss*, No. 09-12-00599-CV, 2014 Tex. App. LEXIS 1612, at **6-7 (Tex. App.—Beaumont Feb. 13, 2014, pet. denied) (mem. op.); *In re Commitment of Conley*, No. 09-10-00383-CV, 2011 Tex. App. LEXIS 7877, at *13 (Tex. App.—Beaumont Sept. 29, 2011, no pet.)

(mem. op.); *In re Commitment of Sprague*, No. 09-10-00228-CV, 2011 Tex. App. LEXIS 4503, at \*\*28-29 (Tex. App.—Beaumont June 16, 2011, no pet.) (mem. op.)).

"The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony." *Mullens*, 92 S.W.3d at 887. The jury may resolve conflicts and contradictions in the evidence by believing all, part, or none of the witnesses' testimony. *Id.* Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found, beyond a reasonable doubt, that Pope is a sexually violent predator, and the evidence is legally sufficient to support the jury's finding. *See* Tex. Health & Safety Code Ann. § 841.062(a); *see also Kansas v. Crane*, 534 U.S. 407, 413 (2002); *In re Commitment of Burnett*, No. 09-09-00009-CV, 2009 Tex. App. LEXIS 9930, at \*\*13-16 (Tex. App.—Beaumont Dec. 31, 2009, no pet.) (mem. op.); *Mullens*, 92 S.W.3d at 885. We also conclude the verdict does not reflect a risk of injustice that compels ordering a new trial. *See Day*, 342 S.W.3d at 213. We overrule issues one and two.

## *Allen* Charge

In his third issue, Pope argues that the trial court's supplemental *Allen* charge was coercive and improper. After the jury deliberated for about two hours, the jury indicated it was unable to reach a verdict but wanted to continue to deliberate. The jury sent a note to the trial court stating that the jury was "at a strong standstill of 11

to 1 votes." The trial court adjourned for the day, sent the jury home, and ordered them to return the following morning to resume their deliberations. The next morning the trial court provided a supplemental *Allen* charge to the jury. Pope objected to the supplemental charge arguing (1) the trial court is "keep[ing] the jurors captive once they've announced they cannot reach a verdict[,]" and (2) that the *Allen* charge's language regarding what effect the jury's standstill would have on County resources was coercive. The trial court overruled Pope's objections to the *Allen* charge.

"An *Allen* charge is a supplemental charge sometimes given to a jury that declares itself deadlocked." *See Barnett v. State*, 189 S.W.3d 272, 277 n.13 (Tex. Crim. App. 2006). "It reminds the jury that if it is unable to reach a verdict, a mistrial will result, the case will still be pending, and there is no guarantee a second jury would find the issues any easier to resolve." *Id.* (citing *Allen v. U.S.*, 164 U.S. 492, 501 (1896)); *see also Howard v. State*, 941 S.W.2d 102, 123 (Tex. Crim. App. 1996), *overruled on other grounds by Easley v. State*, 424 S.W.3d 535, 538 n.23 (Tex. Crim. App. 2014). While such a charge is permissible in both federal and Texas courts, trial courts must carefully word the instruction and administer it in a non-coercive manner. *Barnett*, 189 S.W.3d at 277 n.13.

On appeal, Pope complains of the portion of the trial court's supplemental *Allen* charge requesting the jury to continue their deliberations "in an effort to arrive at an acceptable verdict." Pope argues on appeal that

> [t]he coercive instruction suggests to the jury, especially to the hold-out juror, that the only "acceptable" verdict is a unanimous one, and the hold-out juror's vote is unacceptable and falls short of the trial judge's expectations of a sworn juror in this case.

Pope did not make this complaint to the trial court. At trial, Pope instead objected (1) to the trial court's "keep[ing] the jurors captive once they've announced they cannot reach a verdict[,]" and (2) that the *Allen* charge's language regarding what effect the jury's standstill would have on County resources was coercive. Appellant's objections in the trial court do not comport with the argument raised on appeal. Consequently, he did not preserve his complaint. *See* Tex. R. App. P. 33.1(a); *In re Commitment of Lucero*, No. 09-14-00157-CV, 2015 Tex. App. LEXIS 1098, at *11 (Tex. App.—Beaumont Feb. 5, 2015, pet. denied) (mem. op.); *see also Wasserloos v. State*, No. 09-09-00225-CR, 2010 Tex. App. LEXIS 3144, at **12-13 (Tex. App.—Beaumont Apr. 28, 2010, pet. ref'd) (mem. op., not designated for publication) (appellant failed to preserve his complaint for review because his trial objection to an *Allen* charge was on different grounds than that raised on appeal). Issue three is overruled.

We affirm the trial court's judgment and order of civil commitment.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on March 3, 2025
Opinion Delivered April 10, 2025

Before Golemon, C.J., Johnson and Chambers, JJ.